UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>AHSAN ARTY, a/k/a "Hass"<br><br>Defendant | Criminal No. 22-cr-10328-RGS |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

The government submits this memorandum in support of its recommendation for **120 months of incarceration** for the Defendant, followed by three years of supervised release. This recommendation reflects the seriousness of the offense, the need for deterrence and punishment, and is sufficient but no greater than necessary to accomplish the goals of sentencing. The parties' joint recommendation in the Plea Agreement reflects a guideline sentence that is consonant with justice and accords with the sentencing factors under Section 3553(a).

**THE ADVISORY SENTENCING GUIDELINES**

The government agrees with the offense level calculation provided by U.S. Probation, which calculated the offense level in the final Presentence Report to be 31 (PSR ¶¶7-129).[1] With a criminal history score of zero, the criminal history category is I (PSR ¶¶131-144). Therefore, the guideline sentencing range ("GSR") calculated by Probation is 108 to 135 months (PSR ¶95). The Plea Agreement entered into by the parties under Fed. R. Crim. P. 11(c)(1)(C) calls for a sentence of 120 months, which is within the GSR (ECF #47).

The government also represents that this Plea Agreement reflects certain charging concessions and implicit promises to not separately or substantively prosecute incidents reflected

---

[1] This is consistent with the calculation set forth in the Plea Agreement.

in the PSR that reflects incidents arising during the conspiracies charged in Count One and Count Two. Should the Court adopt the PSR and the offense conduct, and accept the binding Plea Agreement, then the government would agree to not charge ARTY separately for the incidents reflected in the PSR.  This includes:

- the firearms offenses accrued while on pretrial release and subject to pending charges that carry a penalty greater than one year in prison (chargeable e.g. under 18 U.S.C. § 922(n), and 18 U.S.C. § 922(o)). See PSR ¶¶9-12 (prior state arrests), ¶¶89-96 (April 11, 2022, arrest and recovery of machinegun).

- the controlled purchases (chargeable under 21 U.S.C. § 841). See PSR ¶¶13-33, ¶¶85-88.

- the two Hobbs Act robberies and associated charges under Section 924(c). See PSR ¶¶38-48 (reflecting evidence of December 2021 home invasion), ¶¶49-85 and ¶¶97-114 (reflecting evidence of the February 2022, burglary and robbery in Everett).

Accordingly, the government notes that by entering into this Plea Agreement it is implicitly agreeing to not separately charge ARTY with two counts of Hobbs Act robbery under 18 U.S.C. 1951(a), which if subject to charges under Section 924(c) could each carry mandatory consecutive penalties of at least 5 years and could thereby potentially carry cumulative mandatory penalties of seventeen years due to the discharges and brandishing during each incident. See 18 U.S.C. § 924(c)(1)(A).

## ARGUMENT

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment.  See 18 U.S.C. ' 3553(a)(2)(A).  The sentence must also afford "adequate deterrence" for both the defendant and others.  See 18 U.S.C. ' 3553(a)(2)(B) (the court may impose a sentence "to afford adequate

deterrence to criminal conduct"). Lastly, the sentence must protect the public from the further crimes of the Defendant. See 18 U.S.C. ' 3553(a)(2)(C) ("protect the public from further crimes of the defendant"). Consideration of the § 3553(a) factors demonstrates that a sentence of 120 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

### A.     Nature and Circumstances of the Offenses

As described in the presentence report, and as the Court commented at the Rule 11 hearing, the Defendant's crimes sound like the episode of television series. See ECF#53 ("That's a lot to absorb. It sounds like the script of Season IV of Breaking Bad, a lot of activity going on."). A brief recital of these incidents follows.

### 1.    December 10, 2021, Home Invasion in Lawrence, MA

The first home invasion took place on December 10, 2021, in Lawrence, MA. *See* PSR ¶¶38-48. The Defendant and an accomplice broke into a residence wearing masks and brandishing firearms. A third accomplice remained in the vehicle. They were looking for drugs that were believed to be in the premises.

When the female opened the door, they pointed a firearm at her and put a finger to their lips telling her to be quiet. They then walked her to the rear of the residence toward a bedroom where a male was situated. When they reached the bedroom, they pointed a gun at the male as well and the male tried to grab the gun. They pistol-whipped the male with the magazine-well. They then searched the place and were unable to find anything. The follow-up investigation led to the identification of the vehicle involved, and the fact that the vehicle's plate was run by Dedham Police on the night of the home invasion while the vehicle was parked at a gas station. Surveillance from the gas station showed the Defendant exiting the vehicle and entering the store with his mask not raised. The vehicle was later located and towed by police for a court-authorized search.

Text messages from the Defendant's phone showed that he was involved in the robbery and had conducted surveillance of the targeted residence, including a photograph of a firearm ARTY had in his possession. The suspects appear to have conducted hours of planning and surveillance prior to committing the home invasion. Text messages would also show communication by ARTY with the other accomplices concerning the vehicle and payment to its owner for the costs incurred for the storage fees.

### 2. February 10, 2022, Home Invasion in Everett, MA

ARTY also participated in two incidents in February 2022 targeting an individual who resided in Everett, MA. See PSR ¶¶49-85. The victim in the two incidents was an individual who purported to have large amounts of cash, luxury vehicles, jewelry and valuables on hand in various Instagram postings and music videos. In truth, the victim was in fact broke and the jewelry and watches displayed on Instagram were largely fake, and the luxury BMW automobile was rented. ARTY would learn this first-hand from the home invasions he participated in.

Prior to the break-in, ARTY planned this theft with multiple accomplices. There were extensive discussions over encrypted applications between the accomplices about the number of firearms they needed and the proper time and manner to conduct the theft. They intended to conduct the break-in when no one was home, but were going to be armed with firearms in case the victims were present or came home.

On February 10, 2022, at approximately 10:30 PM, ARTY and an accomplice broke into the victim's residence in Everett, at the Batchyard complex. ARTY gained entrance to the building through a key fob associated with an apartment he had previously rented in the building using a stolen or fake identity. Once in the building, they breached the door to the victim's residence through use of a crowbar. When they got inside the apartment, they ransacked the place for jewelry

4

and valuables. None were found. While inside, ARTY decided to send a livestream video of himself conducting the burglary to a number of other Port 44 gang members on Snapchat who in turn stored and saved the video.

Not finding any cash or valuables, ARTY and the accomplice decided to steal designer jeans, clothing, and accessories. These clothes turned out to have little value on the street and could not be sold for great profit, which ARTY lamented to numerous associates. While inside, ARTY did locate and steal the key fob for a BMW believed to belong to the victim. Investigators would later find this key fob during the search of a storage unit rented by ARTY and a female associate.

This burglary was reported to police by the roommate of the intended victim. During the report, police realized that the apartment had been obtained through identity theft. The roommate also told extensive lies concerning the items that were stolen and claimed to have had over $500,000 in jewelry, cash, electronics, and watches stolen from the apartment. This was wishful thinking and entirely false.

Nevertheless, in the hours following the break-in, the victim or some associates of the victim went on social media broadcasting about the break-in and claiming that they remained in possession of all their jewelry and valuables. In short, they taunted the burglars and suggested that the burglary was poorly executed by incompetent criminals. This too was a poor decision.

### 3. February 11, 2022, Home Invasion in Everett, MA

In the hours after the break-in, ARTY and a number of accomplices discussed the social media postings by the victims. Following this, associates of ARTY who were members and associates of the Port 44 gang in Cambridge decided to undertake a second robbery of the victims who apparently remained in possession of cash, jewelry and other valuables that were visible in the social media video.

The following morning on February 11, 2022, three accomplices of ARTY broke into the same residence in Everett, MA that was burglarized the night before. This time, the apartment was not unoccupied. Multiple rounds were fired during the break-in targeting the robbers. The robbers then broke into a second apartment on the same floor. The robbers then made their escape out of the building and fled to the surrounding area, where they were captured surveillance cameras in the area. ARTY was in communication with these individuals and drove to rescue the robbers in a gray Jeep registered to his female associate.

When ARTY arrived, the robbers jumped in his vehicle. Officers were flooding the area and a chase ensued that was terminated when it reached the highway. The following day, the same Jeep would be observed by State Police and a second chase ensued reaching over 110 mph onto city streets. This second chase was also terminated.

The vehicle would later be located near ARTY's residence, towed, and subject to a court-authorized search. Other Port 44 gang members would attempt to retrieve the vehicle from police impound. Text messages between the Defendant and the accomplices showed his displeasure with the fact that the robbers did not provide compensation for the costs associated with the police involvement. ARTY in fact chastised the accomplices for not providing a rental for the female associate's use immediately after the vehicle was seized.

The police responded and found the first apartment ransacked. They located a firearm in the first apartment (the victim's apartment) and then continued to the second apartment where they found a second firearm. Also within the victim's apartment, police located all manner of mechanisms for the commission of credit card fraud and check schemes.

Investigators reviewed the Instagram postings by the victims and they conducted an extensive search of potential suspects. They compared surveillance from their personal

surveillance cameras in the apartment to Facebook profiles and other images of suspects.[2] The victims came to identify the accomplices through photographic comparison of the visible faces and clothing worn by the robbers. In the months following the burglary and home invasion, ARTY and the other Port 44 gang associates were suspected by the victims to have been responsible.

### 4. April 11, 2022, Arrest for Machinegun

On April 11, 2022, at 1:51 AM, shortly before bars and restaurants close in Boston, ARTY was present outside of a nightclub in Chinatown in Boston known as Shojo, when he was arrested for assaulting a police officer with his vehicle, and possession of two firearms, one of which was machinegun. *See* PSR ¶¶89-114. While ARTY was arrested by local police based on 911 calls for a man with a gun outside of the club, federal investigators would learn that the intended victim of the burglary and home invasion from February 10 and February 11 (the "victim") was inside of the nightclub that evening. ARTY was present outside that evening intending to rob the victim as he exited the club.

This nightclub was known to be a venue frequented by so-called "big steppers" and individuals who would display large amount of wealth on Instagram (as ARTY described it in a recording, "That shit was for the big ballers"). These perceived high-wealth individuals who would come to this location wearing large quantities of jewelry and bringing large amounts of cash to pay for bottle service and other extravagances. Additionally, most nightclubs frisk entrants or utilize metal detectors upon entry ensuring that those within the nightclub do not have firearms or other weapons. This causes them to be targeted as they exit the club because the robbers know that they will not be carrying weapons, but will be carrying jewelry, cash, wallets, keys and other valuables. ARTY explained the circumstances of his arrest to a Port 44 associate who is known

---

[2] This footage was not provided to police.

7

to the government.

On April 11, 2022, a friend of ARTY's was in Shojo and observed the victim inside the nightclub. This friend called ARTY and informed ARTY of the victim's whereabouts. ARTY then proceeded to the nightclub with two associates in a vehicle with ARTY driving. Also inside of the vehicle were two firearms, one of which was equipped with a selector switch attachment rendering it capable of fully automatic fire.

ARTY drove the vehicle and arrived at the nightclub. ARTY parked outside and waited across the street from the nightclub in the vehicle. While ARTY was waiting outside in the vehicle for the victim to exit, at 1:51 AM, Boston Police received a 911 call about an individual carrying a gun at the location. A second 911 caller shortly thereafter identified ARTY's vehicle (the same vehicle owned by ARTY's female associate), and claimed the driver was in possession of a gun.

Police arrived located the vehicle, and instructed the Defendant to turn off the vehicle and open the door. The Defendant refused to comply with the commands. The Defendant then accelerated the vehicle at a high rate of speed toward one of the officers that were now surrounding the vehicle. The Defendant's vehicle struck the officer and an unoccupied Ford Escape. It appears that Boston Police fired at the Defendant's vehicle. Noone appears to have been struck.

After the crash, officers ordered the Defendant and the other passengers out of the vehicle. They complied. A search of the vehicle revealed two firearms. One firearm was observed underneath the driver's seat, where the Defendant was seated. This firearm was a Glock 19, 9mm firearm equipped with a selector switch. A second firearm was also found in the vehicle.

ARTY would go on to discuss the incident with an associate. ARTY confirmed that the firearm in the vehicle was in fact a machinegun using coded terminology. Specifically, ARTY and the associate use the term "sneakers" to refer to firearms, and identified the selector switch

attached to the rear of the firearm as the "design on the back of the sneakers" that ARTY was in possession of at the time of his arrest. ARTY also discusses the fact that he believed the victim and the victim's associates must have seen him and called the police because the information was very specific. The associate agrees with that assessment ("*[Victim] and them niggas snitched on you to get you out the way"*). ARTY then described in veiled terms assaulting and getting retribution against the victim for having him arrested ("*Nigga is a bitch bro. Watch when I touch the bricks, I'm gonna give that nigga [victim's street name] a big ass hug and kiss."*).

### 5. August 2021 Theft of Four Kilograms

In August 2021, ARTY travelled to California with a number of associates and stole four kilograms of cocaine that he would then distribute to Port 44 gang members. *See* PSR 34-37. The drug theft was simple.

While in California, ARTY decided to visit the residence of an individual named "Elton." According to ARTY, Elton was employed by a Chinese cartel "sending out they pack or whatever he do for them." Elton had approximately 60 kilograms of cocaine powder in the residence. ARTY took a video of the kilograms of cocaine packaged and stored in boxes on his cellular phone. ARTY then stole four of the kilograms without Elton knowing and shipped them from California to Massachusetts.

ARTY discussed selling the stolen kilograms of cocaine off either by kilogram or by ounce, and noted that he intended to sell them off by ounce as he would be able to get a much greater profit. ARTY intended to make over $100,000 from each of the kilograms, and wanted to buy a watch. ARTY noted that he had $25,000 in cash at his residence. ARTY's residence would later be burglarized and his cash and drugs would be taken by an individual known to the government.

### 6. Conclusion

The Defendant engaged in multiple armed home invasions to steal drugs and proceeds from

those engaged in drug and other crimes.  He possessed numerous firearms and used them during the robberies. He also dealt drugs and brazenly stole them so that he could profit from their sale. All of this drug dealing and violence warrant a substantial period of incarceration, even for an individual who finds himself convicted of his first felony offense and has demonstrated extraordinary acceptance of responsibility by waiving indictment and willingly agreeing to plead guilty to these offenses prior to being formally charged.

### B. Criminal History, Specific Deterrence, Punishment

This is hardly the Defendant's first involvement with the law (PSR ¶¶131-144). His criminal record commences at age 15 with juvenile offenses: larceny over $250 charges that were continued without a finding (PSR 131), and a firearm and marijuana case that was also continued with a finding (PSR 132).

The facts of the larceny demonstrate how brazen the Defendant was at an early age. See PSR 131. At age 15, while a student in high school, the Defendant stole the wallet of a high school administrator out of her bag and pocketbook that were under her desk.  The Defendant was seen in the office at the time of theft, and was later called to the office, where he was found in possession of checks made out to the high school and some of the stolen cash. Less than two years later, he would be arrested for carrying a loaded firearm and marijuana (PSR 132). He received leniency on both cases and was spared any conviction, delinquent finding or confinement. He repaid that grant of leniency by committing further crimes at an astonishing rate.

As an adult, the Defendant would be arrested for numerous drug and cases. When he turned nineteen, the defendant was charged with four cases in a single year: possession to distribute a class D substance in Charlestown District Court (PSR 138), **possession of a large capacity firearm** in Malden District Court (PSR 139), **two counts of possession of a firearm** and

ammunition in South Boston District Court (PSR 140), and possession to distribute a class D substance in Woburn District Court (PSR 141). Somehow, despite two open gun cases and a drug case, the Defendant found himself on the street committing further offenses, while the prior cases remained open and pending. Over the next two years, the Defendant would be charged with two more cases, two of which were for additional firearm offenses: **possession of a firearm**, operating under the influence of liquor, leaving the scene of property damage, and resisting arrest in Chelsea District Court (PSR 142), and **carrying a firearm** without a license in Chelsea District Court (PSR 143).

Despite accruing a total of four cases charging him with possession of five separate firearms, and multiple other open and active cases, the Defendant still was released by from state court after brief periods of detention, and the posting of relatively small cash bails. True to form, while on release for two pending gun cases (PSR 142, 143), he would be arrested again on April 11, 2022, for possession of two guns, after driving at police officers. In the car were **two more firearms**, one which was a machinegun (PSR 144). Finally, the Defendant was detained and he has been custody ever since.

The plea agreement and sentence proposed in this case addresses the Defendant's criminal history. In fact, it holds him accountable for all of his prior firearm offenses that were incorporated into Count Two. This proposed sentence also punishes him for these past offenses, and also a number of crimes that were not previously charged. It is a significance sentence, particularly for an individual with no prior terms of imprisonment apart from pretrial detention. It is also sentence that reflects a measure of restraint on the part of the government in not charging the applicable mandatory minimums.

That being said, the government acknowledges that the Defendant has admitted to these

facts, particularly those related to the previously uncharged violent offenses, prior to the government presenting them to a grand jury and well before proving them to a petit jury. There is degree of the Defendant taking personal responsibility for his crimes that is bound up in the nature of this resolution. This speaks to the potential for his rehabilitation and specific deterrence, and suggests that this 120-month sentence is the proper punishment

### C. General Deterrence, Promotion of Respect for the Law, and Public Protection

General deterrence and promotion of respect for the law must also be considered, and this Court should be mindful of the message that the sentence will send to drug dealers, gang members, and violent offenders.   To that end, a sentence of 120 months for a first-time felon, on a Plea to an Information, sends a strong deterrent message of what sort of sentence can be expected for those who wield firearms, rob others, and profit from the misery of persons addicted to controlled substances.  In this case, that message is even more clarion in that it will be strongly sent to other would-be offenders in state court who lack a serious criminal record and continue to commit violence while on pretrial release. It simply is unacceptable that a Defendant who pleads for release, makes promises to state courts, and finds a receptive ear in the state court for a reduction in bail over the objection of prosecutors, would then go and insult that measure of clemency by committing additional offenses – especially violent offenses - once released. This is all together too frequent of an occurrence and this Defendant is perhaps one of the most flagrant examples.

Many similarly situated offenders in state court might think their cases will dismissed or a lesser penalty is in store if they are released and can press for continuances for years on end. They would be entirely wrong. And the sentence proposed by the parties makes this clear.  Violent offenders and those that utilize firearms, especially machineguns, to harm others and further the drug trade can expect that the full weight of the federal government to come down upon them.

This Plea Agreement accomplishes all of these goals of sentencing: punishment, public protection and deterrence.

This Defendant is also well known to other offenders in the Boston area. His sentence and the sequence of federal involvement in this case will serve as an example and warning to others who know him or know of him, and learn of what took place. It is a simple message: federal law enforcement will investigate you, adopt what pending cases are available, and aggressively prosecute all of your crimes to the fullest extent of the law in order to ensure separate you from society for a sizeable percentage of your adult life.

Had this Defendant not elected to plead guilty to a serious dougle-digit sentence at the earliest opportunity and demonstrated a willingness to accept responsibility and a justly deserved punishment, he could have expected to spend multiple decades in prison for the violence he inflicted on others. He can certainly expect to spend additional years in prison if he reoffends on supervised release. Given the concessions, the government will have little patience for even the most minor of violations. This too is a message of deterrence that the government believes should be sent and will resonate among the offenders in the Defendant's ambit.

This sentence of ten years for a first-time felon will also protect the public from the violence that the Defendant Is. This is a sentence that will remove him from society and justly punish him for the wave of violent crime he committed.  Lastly, the swiftly imposed 120-month sentence -- given the Defendant's acceptance of responsibility, uncontested detention, and willingness to plead guilty without any litigation -- certainly promotes respect for the law.

## **CONCLUSION**

Based upon the foregoing, the government requests that the Court impose a sentence of 120 months, followed by three years of supervised release.

<div style="margin-left: 40%;">
Respectfully submitted,

JOSHUA S. LEVY,
Acting United States Attorney
</div>

By:     */s/ Philip A. Mallard*
        PHILIP A. MALLARD
        Assistant U.S. Attorney
        United States Attorney's Office
        1 Courthouse Way, Suite 9200
        Boston MA 02210
        617-748-3674

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

        */s/ Philip A. Mallard*
        PHILIP A. MALLARD
        Assistant U.S. Attorney

Date:   October 31, 2023